## CONNECTICUT GENERAL LIFE INS. CO. v. DENT.
### No. 2762.

Court of Civil Appeals of Texas. Beaumont.
May 23, 1935.

Rehearing Denied June 19, 1935.

Orgain, Carroll & Bell and Lamar Cecil, all of Beaumont, for appellant.

Howell & Howell, of Beaumont, for appellee.

WALKER, Chief Justice.

This was an action by appellee, Henry J. Dent, against appellant, Connecticut General Life Insurance Company, to recover total permanent disability benefits under a policy of group life and disability insurance, No. G–5039–R, issued by appellant to Gulf Oil Corporation of Pennsylvania and its subsidiary companies. This policy became effective as of date April 1, 1932, replacing policies Nos. G–5039 and G–5545 before this court in Connecticut General Life Insurance Co. v. Moore, 75 S.W.(2d) 329 (in col. 1, p. 330, policy G–5545 is erroneously referred to as G–5534). As between appellant and Gulf Oil Corporation, this policy was issued and delivered upon identical facts with the issuance and delivery of policy No. G–5545, construed in the Moore Case, except as to the following conditions in the application by Gulf Oil Corporation for the insurance, and in the group insurance contract: "It is further requested that Policy G–5039–R be issued in Pittsburgh, in the Commonwealth of Pennsylvania, and that it be governed by the laws of that Commonwealth." The policy provides as follows: "This contract is issued and delivered in the city of Pittsburgh, in the Commonwealth of Pennsylvania and is governed by the laws of that Commonwealth." And, as between appellant and appellee, an employee of Gulf Refining Company, a subsidiary of Gulf Oil Corporation, and entitled to the benefits of policy No. G–5039–R, the certificate of insurance was issued and delivered to appellee on identical facts with

the issuance and delivery of the certificate to the insured in said policy No. G–5545.

As we understand the facts of this case, every fact relating to the application by appellee to appellant for this insurance, the issuance by appellant to appellee of the certificate of insurance, the conditions and manner of the payment by appellee of the premiums, the acceptance by appellant of the premiums, and conditions of the payment of the benefits under the policy, were identical with like conditions of policy No. G–5545; that is to say, as between appellant and appellee, the facts of this case are absolutely on all fours with the facts of policy No. G–5545. The case was submitted to the jury on the following issues, answered as indicated:

"Special Issue No. 1. Do you find from a preponderance of the evidence that Henry J. Dent is totally disabled, as that term has been herein defined?" Answer: "Yes."

"Special Issue No. 2. Do you find from a preponderance of the evidence that such total disability, if any you have found is permanent, within the meaning of the definition as herein given you?" Answer: "Yes."

"Special Issue No. 3. Do you find from a preponderance of the evidence that such total permanent disability, if any you have found, commenced in the month of January, 1933?" Answer: "Yes."

"Special Issue No. 4. What, do you find from a preponderance of the evidence, was the age of Henry J. Dent in the month of January, 1933?" Answer: "43 years old."

"Special Issue No. 5. Do you find from a preponderance of the evidence that the defendant, Connecticut General Life Insurance Company, was doing business in the State of Texas on and from April 1, 1932, up to and including January 31, 1933?" Answer: "Yes."

"Special Issue No. 6. Do you find from a preponderance of the evidence that any disability existing to the plaintiff, if any, is not partial. Answer 'it is partial' or 'it is not partial' as you find the facts to be." Answer: "It is not partial."

"Special Issue No. 7. Do you find from a preponderance of the evidence that plaintiff's disability, if any, is not temporary? Answer 'it is temporary,' or 'it is not temporary,' as you find the facts to be." Answer: "It is not temporary."

"Special Issue No. 8. Do you find from a preponderance of the evidence that plaintiff's disability, if any you have found, could not at any time during the month of January, 1933, have been relieved by reasonable medical treatment to such an extent that same would not be total, if you have so found? Answer 'it could be relieved' or 'it could not be relieved' as you find the facts to be." Answer: "It could not be relieved."

"Special Issue No. 9. Do you find from a preponderance of the evidence that plaintiff's disability, if any you have found, could not be cured by reasonable medical treatment after January 31, 1933? Answer 'it could be cured' or 'it could not be cured,' as you find the facts to be." Answer: "It could not be cured."

"Special Issue No. 10. Do you find from a preponderance of the evidence that plaintiff's disability, if any you have found, could not be relieved at any time after January 31, 1933, by reasonable medical treatment to such an extent that same would not be total, if you have so found? Answer 'it could be relieved,' or 'it could not be relieved' as you find the facts to to be." Answer: "It could not be relieved."

"Special Issue No. 11. What amount, if any, do you find from a preponderance of the evidence would be reasonable attorneys' fees for the prosecution and collection of plaintiff's claim, if any, on Certificate No. R–24023? State the amount in dollars and cents, if any. In determining this issue you will take into consideration all benefits, if any, to the plaintiff incident to the prosecution of the suit, both those accrued, if any, and to accrue, if any, on account of such certificate." Answer: "$175.00."

The judgment effectuated the verdict of the jury.

### Opinion.

Policy No. G–5039–R, in so far as it covered appellee, was a Texas contract, and therefore appellee was entitled to his statutory damages and reasonable attorneys' fees. Connecticut Gen. Life Ins. Co. v. Moore, supra, in construction of policy G–5545.

The conditions of policy No. G–5039–R and the application upon which it was issued, to the effect that it was to be governed by the laws of Pennsylvania, do not distinguish it from policy No. G–5545 on the issues between appellant and appellee. These conditions bind only appellant and Gulf Oil Corporation. They

are no part of the contract between appellant and appellee, which takes its color from the conditions of the certificate of insurance and the facts attending its execution and delivery to appellee. Connecticut Gen. Life Ins. Co. v. Moore, supra. All the authorities cited by appellant on this point are in construction of the application and the policy of insurance as between appellant and Gulf Oil Corporation.

The verdict of the jury constitutes an ultimate finding that appellee was totally and permanently disabled at the time when this policy of insurance was in full force and effect. The jury found that he was totally and permanently disabled as of date of the trial, and that such total permanent disability "commenced" in January, 1933, at which time appellee was entitled to the benefits of policy No. G–5039–R. The point made by appellant is that the word "commenced" does not necessarily mean that appellee was totally and permanently disabled in January, 1933, but only that such disability "commenced" at that time. As we construe the verdict, the jury found that the disability became total and permanent in January, 1933.

Special issue No. 11, with the charge accompanying it, was not subject to the following exceptions:

"53. Defendant further objects to the submission of Special Issue No. 11 and particularly the explanatory portion following same, for the reason that it is in the nature of a general charge; and defendant further objects to said explanatory matter following Special Issue No. 11 for the reason that it is speculative and conjectural and will allow the jury to consider matters neither plead nor proved.

"54. Defendant further objects to the explanatory matter immediately following Special Issue No. 11, because:

"(a) It has no support in the pleadings;

"(b) It has no support in the evidence.

"55. Defendant further objects to the explanatory matter immediately following Special Issue No. 11 for the reason that there is no evidence as to what benefits, if any, would or may or may not accrue to the plaintiff incident to the prosecution of this suit, and as submitted said explanatory matter will allow the jury to speculate upon matters which have not

been introduced in evidence and which have not been plead."

We give in full appellant's bill of exception complaining of certain argument by appellee's counsel:

"Be it remembered that upon the trial of the above entitled and numbered cause, upon the 29th day of June, A. D. 1934, while counsel for plaintiff, Mr. Leon P. Howell, was making his closing argument to the Jury, the following took place, to-wit: Counsel in his closing argument to the Jury stated that plaintiff, a former stillman at the Gulf Refining Company, had paid to the defendant certain premiums monthly in advance for the insurance benefits for which he was suing in this cause, and after so stating made substantially the following remarks: 'Yes, they took $1.50 per month from this negro man's stipend, as that insidious disease grawed at his very vitals—money in blood, running out of the stills of the Gulf Refining Company, and now they won't pay him.'

"Whereupon the Court, on his own motion, stated as follows to the Jury: 'Gentlemen of the Jury: Disregard that argument about blood coming from the stills of the Gulf Refining Company. There is no evidence in this record of any blood coming from the stills of the Gulf Refining Company.'

"Whereupon, counsel for defendant stated: 'Your Honor, we still wish to reserve our exception to the prejudicial argument of counsel for plaintiff.'"

Syphilis was "that insidious disease" referred to by counsel in the argument. The testimony offered by appellee clearly raised the issue that he was suffering from syphilis in January, 1933; that he had been suffering from that disease a long time; and that as a result of that disease he became totally and permanently disabled at the time found by the jury. The testimony was further to the effect that in the month of January appellee was working in the coke stills of his employer. Appellee thus described the nature of his employment:

"At the time I was laid off I was cleaning coke stills. That is hard work and hot work, because when we have to clean a coke still, we had to go into it two hours and a half or three hours after it is opened, after the head is taken off, and put some water in it. Three hours after the head is taken off we have to go into

it and go to work; six hours after it is open, we have to turn that still in; that is, in three hours' time we have to have it cleaned. We had to put on plenty of clothes and wood shoes and wrap all our head up, just as much rags as we could get on there, in order to protect us from the heat in there. One man had to go in there with a spud bar and break the coke up and three men would go in there with shovels. If the lumps were the size you could bring out in your hand he would take them in his hand and bring them to the door; if it was small he would take a shovel. At times it would be so hot, fire would be all in the coke, and smoke in there; yellow smoke; sometimes you could hardly see a man in there. We had to work so fast until we would have to run like horses; one right behind the other; go down on one side and come back on the other. I did this work two years and seven months. Twice, once in November, 1932, and the last time on January 7, 1933, I got overheated and had to go out where I could stretch out. I had to lay in the shade until I could cool off, then I left the job.

"About the time I got laid off, when I got hot and overheated, things looked like shadows before me, and I couldn't get my breath; I would be so hot until the breath that came out of my mouth felt almost like steam from some water, and I would be so hot in there I couldn't sweat. I was crazy about the head and just dizzy, and just give out and had to fall out and vomit. I had a kind of pushing in my head; it seemed like something was coming over my head and down into the bridge of my nose, like it was going to smother me; got right there and wanted to come out, and looks like I could feel it running around in there—felt funny. In November of 1932 I began feeling the effects of some illness or disability, and had to lay off from work somewhere about eight or ten or twelve days. My condition got to where I couldn't clean a still. All along, before my employment was terminated by the Gulf Refining Company, when I would go in a still to go to work I just would start in working and make one or two trips and after that I would be out; go in and make a couple of rounds, and had to come out; I couldn't stay. I stayed around on the job until I got laid off, but I wasn't able to do my full part of the work; just laying around there from November, 1932, until January, 1933. The trouble suddenly came on me in November, 1932, when the rush came on in the stills and they were working night and day, and it kept growing worse until I was laid off; it reached its climax January 7th. If times got better and the Gulf started putting coke still cleaners on, I don't feel like I could go back out there and go to work; not even if I collect this insurance."

Dr. F. W. Sutton, after testifying that appellee was a syphilitic, and that his physical condition was the result of that disease, continued:

"Q. With reference to whether or not, doctor, in your opinion, this condition is curable, or was curable when you first saw him in February, 1933? A. No, I don't believe that treatment would have cured him; it might have arrested it, but as far as being cured—any damage to the nerve tissue is permanent.

"Q. With reference, doctor, to whether or not, if this man engaged in any muscular effort or physical exertion, or would have back in 1933 when you first saw him, if it would in any manner endanger his life; what are the facts about that? A. Yes, it could have endangered his life by causing either a stroke of apoplexy, or, in his condition, you would expect the walls of the arteries, because of the syphilis, to be somewhat weakened, and then, in addition to that it is very likely to have made his whole condition worse.

"Q. Please state, doctor, from these various examinations, whether or not in your opinion you believe that this man would be totally and permanently disabled from a medical standpoint sufficient that he would be unable to engage in work and labor as of the first time you saw him. A. In my opinion, he was.

"Q. Will you tell the jury now that this man has or did in 1933, locomotor ataxia? A. As I said before, it is not a very well developed case of locomotor ataxia; it is more cerebro-spinal syphilis. * * *

"Q. Yes; it's just a question—your testimony is that you don't think, in the condition you found him in, that he could do the severest type of manual labor without some danger to himself; is that right? A. Well, I don't think he should have done any hard work at all, not manual labor that would subject him to heat or very much effort.

"Q. In other words, you don't think he should have cleaned out coke stills? A. No, I don't think so.

"Q. Doctor, in your opinion, did this man have some degree of locomotor ataxia when you examined him in February, 1933? A. Yes, sir; that was my idea.

"Q. You stated that the condition of the blood pressure alone was not alarming, but taken in connection with the syphilis condition you found, what are the facts about it? A. Yes; as I said before, it wasn't the blood pressure alone, but with the syphilis that you would expect the arteries to be more weakened than they would be in a normal person.

"Q. Then state, doctor, if that weakened him or exerted him, if that would be any detriment to his condition? A. Yes, any great exertion, as I said before, would.

"Q. With reference to this condition as a whole, his generally debilitating and weakening situation, what are the facts about that? A. Yes, it is."

The bill of exception shows that the trial court charged the jury to disregard that portion of the argument complained of; in view of this charge the argument should not be construed as reversible error.

The judgment is affirmed.